AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court
## For The District of Columbia

**UNITED STATES OF AMERICA**

v.

**CHRISTOPHER COOK**

## CRIMINAL COMPLAINT

**CASE NUMBER:**

**(Name and Address of Defendant)**

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. From on or about **May 17, 2005 until February 28, 2007** in **WASHINGTON** county, in the _____ District of **COLUMBIA** defendant(s) did, (Track Statutory Language of Offense)

knowingly combine, conspire, confederate and agree together to commit money laundering under Title 18, United States Code, Section 1956.

in violation of Title **18** United States Code, Section(s) **1956(h)**.

I further state that I am **SPECIAL AGENT STEVEN T. SOGGIN**, and that this complaint is based on the following facts:

**SEE ATTACHED STATEMENT OF FACTS**

Continued on the attached sheet and made a part hereof:    ☒ Yes   ☐ No

_____
Signature of Complainant
**SPECIAL AGENT STEVEN T. SOGGIN**
**U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT**

Sworn to before me and subscribed in my presence,

_____ at    **Washington, D.C.**_____
Date                                                                   City and State

_____         _____
Name & Title of Judicial Officer                        Signature of Judicial Officer

**AFFIDAVIT IN SUPPORT OF
SUPPORT OF AN ARREST WARRANT**

1. I am a Special Agent of the United States Department of Homeland Security, U.S. Immigration and Customs Enforcement (ICE), empowered under the authority of Title 19, United States Code, Section 1589a. I am assigned to the anti-money laundering unit of the Washington/Baltimore High Intensity Drug Trafficking Area (HIDTA), whose function is to identify, disrupt, and dismantle sources of illicit funding occurring within the United States and abroad.

2. I have served as a special agent with the U.S. Customs Service, and then ICE, since July 2002. Prior to my current position, I served three years as a Special Agent for the Inspector General of the United States Department of Transportation in Washington, D.C. From 1992 to 1999, I served as an Inspector and program manager with the U.S. Customs Service in its field and headquarters offices. I have received training and gained experience on matters involving violations of smuggling and diversion of money and merchandise, financial crimes, computer fraud and intellectual property rights. I earned a Bachelor of Science Degree in Political Science and a Master of Science in Information Systems.

3. I make this affidavit in support of an application for an arrest for William Poynter, James Franklin Smith, and Christopher Cook.

**BACKGROUND OF INVESTIGATION**

4. In November 2005, ICE Special Agents obtained information at a meeting in Washington, D.C., between a real estate agent and a confidential source (CS) that William POYNTER, a certified public accountant (CPA), is a person whom the CS could approach to launder drug proceeds. The CS discussed with the realtor the need to launder six million dollars in illegal proceeds and a need to disguise the source of the funds to avoid detection by authorities. The realtor advised the CS that POYNTER is a person who can establish offshore bank accounts and companies for the purpose of laundering money and hiding proceeds of criminal activity. The real estate agent referred to POYNTER as the CPA of the "underworld." The realtor put CS in contact with POYNTER for the purpose to discuss the laundering of purported dug proceeds.

5. On or about November 18, 2005, POYNTER met with the CS at POYNTER's accounting firm at 9320 Annapolis Road, Suite B, Lanham, Maryland 20706. The meeting was consensually recorded. POYNTER introduced to the CS a person named, "Chris," (later identified as Christopher Cook), whom POYNTER identified as a mortgage broker. During the meeting, POYNTER and Chris were told by CS that he had $500,000 of drug proceeds that he needed to be laundered. POYNTER proposed numerous investment schemes to launder the CS's money. In one scheme, POYNTER said he could open up a non-profit company in which no taxes would be paid. A second scheme that POYNTER proposed was the creation of bank accounts to launder money and the movement of the money through "dummy companies." A third scheme POYNTER offered was to launder the CS's money through a church. POYNTER noted that the church is out of business, but he would be able to make it appear that drug money was actually proceeds generated from the church. During this meeting, POYNTER and Chris provided the CS documents suggesting different ways in which to place and layer funds, including a fictitious company to utilize, complete with an

IRS number.

6. There were several meeting between the CS and POYNTER. During some of these meetings, POYNTER introduced CS to other individuals who would assist I laundering the drug proceeds. One of the individuals introduced to CS by POYNTER was James Franklin SMITH.

7. Prior to April 28, 2006, SMITH had agreed to lauder approximately $30,000 in United States Currency for CS. On April 28, 2006, CS, MPD Detective Robinson, and ICE S.A Bryon Bragg, who were posing as a part of the drug organization, met SMITH. The parties met in the Wendy's Restaurant parking lot next to Mr. Poynter's office. SMITH agreed to deposit $28,400 in purported drug proceeds for a fee of $1600. Wiring instructions were given to SMITH as was $30,000 ($28,400 to be deposited and $1,400 for Mr. Smith's services) in United States Currency. SMITH entered the Bank of America located at 9436 Lanham-Severn Road, Seabrook, Maryland, and deposited $28,400 into an account in the name of the True Faith Deliverance Church. The bank employee prepared a Currency Transaction Report in SMITH's name. On April 29, 2006, SMITH returned to the Bank of America and completed the wire transfer of $28,355 ($28,400 less a $45.00 bank wire fee) to the bank account in London, England.

8. On June 27, 2006, an undercover ICE special agent (UCA) and CS met with POYNTER and SMITH. The purpose of the meeting was to provide POYNTER and SMITH with U.S. Currency to launder. The meeting took place at POYNTER's business at 9320 Annapolis Road, Lanham, Maryland. SMITH was given $40,000 in United States Currency; $37,500 to be laundered, and $2,500 for POYNTER and SMITH's services. That day, SMITH went to the Bank of America located at 9436 Lanham-Severn Road, Seabrook, Maryland, and deposited the $37,500 into an account in the name of the True Faith Deliverance Church. The bank employee prepared a Currency Transaction Report in Mr. Smith's name. Shortly after the illegal money transfer, all of the parties returned to POYNTER's office. An envelope containing $2,500 in United States Currency was handed the envelope to Mr. POYNTER, as his fee. Written on the outside of the envelope were the words "Mr. Poynter" and "$2,500." POYNTER then handed the envelope to SMITH.

9. On August 8, 2006, the UCA and CS met again with POYNTER and SMITH, at POYNTER's business. The purpose of the meeting was to provide POYNTER and SMITH with $60,000 in U.S. Currency, purported to be from the sale of cocaine. Shortly thereafter, while at the CPA's office, the UCA retrieved from a duffle bag containing $60,000 in U.S. Currency. In an envelope was $3,500 in commissions with the hand-written words, "Mr. Poynter. . . $3,500." The UCA handed to POYNTER the envelope containing $3,500 cash and POYNTER accepted it. The CPA discussed the commission with SMITH, his business partner, and then handed the envelope to SMITH. SMITH then took some of the money out of the envelope and handed it to POYNTER, at which time POYNTER placed the money in his pocket. SMITH then wet to the BB&T Bank located at 9395 Lanham-Severn Road, Lanham, Maryland. SMITH deposited $56,500 in a bank account in the name of the True Faith Deliverance Church.

_____

SWORN AND SUBSCRIBED THIS _____ DAY OF February, 2007.

_____
U.S. MAGISTRATE JUDGE